IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| CHRISTOPHER FLORES | § | |
| v. | § | CIVIL ACTION NO. 6:21cv145 |
| JENNIFER SANDERS, ET AL. | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

The Plaintiff Christopher Flores, an inmate of the Texas Department of Criminal Justice - Correctional Institutions Division proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The lawsuit was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges. The Defendants remaining in the case are TDCJ officials Richard Babcock, Jennifer Sanders, and Lourens Jackson; two other defendants, Officer Susan Cunningham and former TDCJ official Shayna McArthur, have previously been dismissed from the case.

**I. The Plaintiff's Complaint**

In his original complaint, Plaintiff stated that on September 25, 2020, Warden Babcock ordered Officer Lourens Jackson to lock Plaintiff up for an investigation. Because of this order, TDCJ Administrative Directive 03.72, security memorandums, and post orders all mandated that Plaintiff's personal property be confiscated and inventoried. Plaintiff asserts that Warden Babcock intentionally and in bad faith misclassified him as a mental health patient and had him involuntarily committed to a mental hospital, the TDCJ Mental Health Therapeutic Diversion Program, without any type of hearing for 54 days.

1

That same day, Plaintiff contends that Warden Babcock ordered Officer Jackson to house Plaintiff in a "filthy, dilapidated, roach- and vermin-infested cell, wearing no clothing, with no mattress, sheets, blanket, towel, basic elements of hygiene or cleaning supplies whatsoever." He says that from September 25 until November 17, 2020, Warden Babcock intentionally left him in "subhuman conditions of confinement, denying plaintiff the minimal civilized measure of life's necessities, thereby exposing him to a substantial risk of serious harm, despite repeated verbal and written complaints, grievances, I-60's and phone calls from plaintiff's family, in violation of plaintiff's well-established Eighth Amendment right not to be subjected to callous and deliberate indifference."

On October 2, 2020, Plaintiff states that Officer Susan Cunningham, acting in bad faith and with evil intent, outside of her lawful authority, enforced TDCJ Administrative Directive 03.72 against him in an arbitrary and capricious manner so as to deprive him of his personal property. He contends that she subjected him to punishment, without prior notice or fair warning, that he could not possess commissary for more than 60 days, in violation of his right not to be punished for an act which he could not have known was prohibited.

On October 8, 2020, Plaintiff contends that Jennifer Sanders, Chief of Unit Classification, officially committed him to a mental hospital, the TDCJ Mental Health Therapeutic Diversion Program, without a hearing. She also left him in "subhuman conditions of confinement" from October 8, 2020 until November 17, 2020, as part of a conspiracy with Warden Babcock. For relief, Plaintiff states he is seeking unspecified declaratory and injunctive relief, as well as nominal and punitive damages.

Plaintiff filed an amended complaint dated August 16, 2021 (docket no. 34). This amended complaint added additional claims against former officer Shayna McArthur and also refers to an unknown individual who made a false entry on a Form I-47MI, apparently indicating that a disciplinary hearing occurred when in fact no hearing was ever held. The claims raised in the amended complaint against the Defendants Babcock, Jackson, Cunningham and Sanders are

unchanged from the original complaint. While another amended complaint appears on the docket at no. 38, this appears to be the same as docket no. 34 - both documents reflect that they were signed on August 16, 2021 and the signatures appear to be identical.

The Defendants Babcock, Jackson, Cunningham and Sanders filed a motion for summary judgment based upon exhaustion of administrative remedies, to which Plaintiff filed a response. This motion was granted as to Cunningham and denied as to the Defendants Jackson, Babcock, and Sanders on February 17, 2023. (Docket no. 123).

This order explained that at that time, there were three claims remaining in the case: (1) that Defendants Richard Babcock and Jennifer Sanders had Plaintiff involuntarily committed as a mental health patient without any type of hearing; (2) that Defendants Babcock, Sanders, and Lourens Jackson confined Plaintiff in a "filthy, unsanitary, dilapidated, roach and vermin infested cell, wearing no clothing, with no mattress, sheets, blankets, towel, basic elements of hygiene, or cleaning supplies whatsoever"; and (3) that Defendant Susan Cunningham wrongfully deprived Plaintiff of his personal property and did not allow him to possess commissary items for over sixty days without due process. The order dismissed the claims against Cunningham, leaving only the claims concerning involuntary commitment and confinement in an unsanitary cell.

Following the denial of their motion, the remaining Defendants filed a motion for summary judgment on the merits on June 20, 2023. Plaintiff has filed a response to this motion, as well as a motion to strike summary judgment evidence filed by the Defendants and a motion for summary judgment of his own.

## II. The Defendants' Motion for Summary Judgment on the Merits

In their motion for summary judgment, Defendants state that for most of September of 2020, Plaintiff was housed on the Michael Unit in 19 Dorm. On September 25, 2020, guards observed Plaintiff and another inmate gaining access to the attic of the dorms. Prison officials believed that Plaintiff and the other inmate, possibly with the cooperation of staff members, were trying to hide dangerous contraband in the attic before a major shakedown. An investigation was begun and

Plaintiff and the other inmate were moved to 12 Building pending the outcome of the investigation. Plaintiff had a medical examination before he moved, which noted his lack of prior mental health treatment and that he was not suicidal.

The Defendants say that from September 25 until November 17, 2020, Plaintiff was housed in 12 Building C Pod cell 61. The explain that 12 Building consists of single cells and all inmates are required to have escorts to leave their cells.  The building contains inmates in restrictive housing (i.e. administrative segregation), inmates in the Mental Health Treatment Diversion Program (MHTDP), inmates in pre-hearing detention, and inmates in various types of transient status. The Defendants state that Plaintiff was not in restrictive housing, pre-hearing detention, or MHTDP, but rather was in transient status pending the investigation.

While on 12 Building, the Defendants state that Plaintiff retained his G2 custody level, which allowed him certain privileges such as access to commissary and the ability to keep permissible property in his cell. He was not subject to any restrictions which applied to inmates in restrictive housing, pre-hearing detention, or to inmates with classification levels below G2.

The Defendants assert that all inmates assigned to 12 Building, including Plaintiff, are supplied with necessities upon their arrival. These necessities include mattresses, sheets, towels, boxers, socks, shirts, and pants.  Jackets and blankets are issued seasonally and state issued hygiene items are passed out weekly or upon request.

According to the Defendants, a full inventory was taken of Plaintiff's belongings, other than the essentials provided upon his arrival at 12 Building, on October 2, 2020.  This inventory showed that Plaintiff had three pairs of shorts, two pairs of shoes, two pairs of socks, two pairs of thermal pants, a thermal shirt, two T-shirts, and various hygiene items such as toothbrushes, toothpaste, soap, razors, lotion, hair gel, chapstick, and combs, as well as a number of food and personal items.  Some of these items had not been purchased through the commissary and others - including a hot pot, a plug splitter, and a commissary bag - had been altered. The Defendants say that Plaintiff received a disciplinary case for possession of contraband and the contraband items were confiscated.

The Defendants state that inmates at the Michael Unit are provided with cleaning supplies every Thursday or upon requests. Officers fill out daily activity logs, known as I-216's, every day which contain cell cleanliness inspection notes.  The Defendants add that if a cell deficiency is not open and obvious, it is the responsibility of the inmate to report deficiencies to the officers for inclusion on the form. The logs for 12 Building, C Block contain no cell deficiencies for Cell 61 between September 25 and November 17, 2020.

On October 18, 2020, the Defendants state that Plaintiff submitted an I-60 request saying that he had been mis-housed because someone had mistakenly changed his classification from transient to MHTDP.  The program manager for MHTDP, David Stebbins, responded by informing Plaintiff that he was not in MHTDP, and Plaintiff filed another I-60 request acknowledging that he was not in MHTDP and asked how to get moved back to general population. Stebbins advised him to contact the classification department.

Plaintiff also filed grievances about his placement in 12 Building, although these grievances variously said that he was being held in pre-hearing detention and MHTDP.  The responses to these grievances indicated that Plaintiff was in "overflow transient" status pending an investigation.

On November 17, 2020, when the investigation was complete, the Defendants state that Plaintiff was moved to 7 Building, which is less restrictive than 12 Building and does not require the use of escorts. Plaintiff is no longer at the Michael Unit but has been transferred to the Stiles Unit.

Based upon their summary judgment evidence, the Defendants argue that: (1) Plaintiff's property-related claims should be dismissed for failure to allege personal involvement by any of the remaining Defendants; (2) Plaintiff's Eighth Amendment claims are refuted by the evidence; (3) Plaintiff's Fourteenth Amendment equal protection and due process claims are refuted by the evidence; (4) Plaintiff's claims for compensatory damages are barred by the lack of showing of physical injury; and (5) the Defendants are shielded by qualified immunity.

In his response to the Defendants' motion for summary judgment (docket no. 139), Plaintiff says that he was never observed gaining access to the attic of the dorms. Consequently, he says that there was never a "legitimate" investigation which would require 54 days to complete.

Plaintiff contends that 12 Building only houses inmates in security detention, pre-hearing detention, and transient status pending the outcome of an investigation. He says that Sanders assigned him to MHTDP on October 8, 2020. Prior to that, he says that he was placed in "pending ad seg placement / transient pending ad seg placement" on September 25, 2020 by Babcock. On October 19, Plaintiff says that Sanders changed him back from MHTDP to transient pending ad seg placement.

Although he was supposed to have had various privileges while in 12 Building, including access to the commissary and the ability to keep his property, Plaintiff says that in fact, the defendants were in physical possession of all of his personal property, including clothing and hygiene items, until October 9, when restrictive housing officer Barbara Neal gave him the remainder of his personal property which had not been confiscated. He says that he received nothing upon his intake into 12 Building and that he was subjected to restrictions beyond those imposed on inmates in restrictive housing or pre-hearing detention.

Similarly, Plaintiff says that hygiene materials were not consistently passed out and were denied when requested. He says that while he had been in possession of the listed property prior to being locked up, he did not receive anything until October 9, 2020. He says that he had purchased "the majority of the confiscated items" through the commissary and that cleaning supplies not consisting of "bippy" were never passed out during his stay in 12 Building.[1]

Plaintiff contends that while guards are supposed to fill out I-216 logs completely and accurately, this does not happen. Despite his numerous verbal and written complaints about his cell,

---

[1]This Court has explained that "Bippy is an all-purpose cleanser, like Comet, that is mixed with water and can be used to clean any area of the offender's cell, including sinks, toilets, floors, walls, and bunk beds. Bippy is used instead of Lysol or bleach because it is not hazardous to humans when it is mixed with water." Conlin v. Quarterman, civil action no. 1:08cv92, 2010 U.S. Dist. LEXIS 101389, 2010 WL 3816706 (E.D.Tex., September 7, 2010).

Plaintiff says that there is not a single notation on the I-216's provided by the Defendants, and in fact there is not a single notation of any cell deficiencies in C Block from August 20 to November 30, 2020. Plaintiff points out that inmates have no way of ensuring that a guard filled out an I-216 noting the inmate's verbal complaints.

Plaintiff acknowledges that he sent two I-60 requests, once of which complained that he was mis-housed because his classification had been mistakenly changed from transient to MHTDP and one saying that he was not in the MHTDP; however, Plaintiff says that the second of these was sent to acknowledge that he had been removed from MHTDP after being mistakenly assigned there. He also asserts that the Defendants do not mention the many other I-60s and letters which he sent complaining about his cell conditions and his improper assignment to MHTDP.

Likewise, Plaintiff says that he initially filed a grievance about being assigned to pre-hearing detention, but after he learned that he had been put in MHTDP, he began filing grievances and I-60's about that. He says that the pod and cell in which he was placed was specifically designated for restrictive housing inmates, classified as mentally ill, who were enrolled in the MHTDP.

Plaintiff asserts that Babcock ordered that he be locked up knowing that this would result in the confiscation of all of his personal property. He claims that just because Babcock designated the physical packing and inventorying of the property to her subordinates makes Babcock "no less culpable" because it "could not have been effectuated with Defendant Babcock's direction." He says that the summary judgment evidence shows that Jackson acquired custody and control of Plaintiff's property on or about September 27, 2020, but deliberately withheld it from Plaintiff until October 9, when he sent it to Barbara Neal who returned it to Plaintiff.

Next, Plaintiff contends that the summary judgment evidence shows he was purposefully subjected to prolonged bitter cold with no protective clothing, in a "filthy, dilapidated, roach and vermin-infested cell spattered with the bodily fluids of the previous occupant, with no access to a mattress, linens, personal hygiene, or cleaning supplies whatsoever." He says that the cell was

"completely trashed out, filled with garbage and mattress stuffing, with an abundance of insects, and roaches," and that when the sun went down, "the rats would come out in droves."

Plaintiff says that he was stripped of his clothes and given only boxers and shoes, and then forced into a bitterly cold cell where he was forced to freeze until September 28, when he was given sheets and socks to use to try to stay warm. However, the sheets and socks were confiscated in a shakedown on October 1, and he did not receive replacements until October 5.

As soon as he was placed in the cell, Plaintiff asserts that he was exposed to the feces and bodily odors of the previous occupant. He also says that when the psych patients in his section became angry, they would stop up the toilets and flood the run, causing sewer water to flow into his cell from the bottom of the door, where it remained until it dried up on its own.

According to Plaintiff, he received his first shower on October 3, nine days after his placement in restrictive housing. He had no soap and so could only rinse off with water, which he did while standing on his heels because he had no shower shoes.  Plaintiff states that he received his first roll of toilet paper on October 5 and his next roll on October 30, followed by rolls on November 7 and November 13. He received his first soap on October 5, consisting of five tiny bars of state soap, and his toothbrush and toothpaste on October 2.

Plaintiff states that he received his first cleaning supplies on October 18, consisting of approximately one-half ounce of Bippy in a conical paper cup. He received more half-ounce portions on October 30 and November 7, 2020. He says that he received his first hot meal on October 24.  Finally, Plaintiff says that due to the overall conditions of his cell, sleeping was "next to impossible."

Plaintiff avers that Jackson knew that the cell in which Plaintiff was placed was uninhabitable because Jackson personally went inside the cell twice before forcing Plaintiff into it. He says that when Sgt. Sallee returned to meet with Jackson and Lt. Sandel, Sallee also saw how filthy the cell was and commented "man, I thought the cell I put that other guy in was trashed out."

Although Plaintiff objected, he says that Jackson ignored him and slammed the food slot, trapping Plaintiff inside "what was essentially a cesspool."

Plaintiff states that Sanders knew that he was being subjected to unconstitutional conditions of confinement because Plaintiff's sister Adrienna Salas called the Michael Unit on October 8 and spoke to Sanders, telling her exactly what Plaintiff had written in a letter. Plaintiff states that he also sent Sanders some 15 I-60's complaining of the unconstitutional conditions of confinement and his improper housing in MHTDP. He also says that he spoke to some ten prison officials, as well as a mental health counselor and a nurse, about his conditions of confinement and improper housing in MHTDP, and sent some eight different letters to Sanders' supervisors in Palestine and Huntsville. He points to an I-60 he wrote asking about his placement in MHTDP, to which the response from David Stebbins says that he is not in MHTDP and he should contact classification to be moved. (Docket no. 133-5, p. 2).

In addition, Plaintiff says that mental health practice manager David Stebbins contacted Sanders on October 19, 2020, upon Stebbins' learning that Plaintiff had been improperly assigned to MHTDP by Sanders.

Plaintiff asserts that Babcock knew he was being subjected to unconstitutional conditions of confinement because Plaintiff's sister called the Michael Unit and spoke to Babcock's secretary. He says that he sent Babcock some 15 I-60's, spoke to ten prison officials plus a mental health counselor and a nurse, and sent some eight letters to Babcock's supervisors in Palestine and Huntsville.

Plaintiff notes that all of this was going on during the Covid-19 pandemic. He acknowledges that TDCJ implemented policies and procedures to prevent the spread of Covid-19, including distributing weekly packets of bleach to inmates in general population, encouraging the cleaning and sanitizing of all areas, especially the housing areas, and assigning staff members to go around the unit spraying bleach solution on frequently touched objects and surfaces.

However, Plaintiff states that Babcock ordered a unit-wide lockdown on September 18 and did not allow any workers to go to work.  This meant that the janitors assigned to 12 Building could not clean and sanitize the recently vacated cells as they normally did. As a result, he says that he was forced to move into a cell that was a "total shambles." He contends that Babcock knew that there were no janitors available to clean and sanitize the cell to which Plaintiff was assigned, where sanitation was needed more than anywhere else on the unit, but nonetheless ordered Jackson to force Plaintiff into a "frigid cesspool."

Plaintiff also says that when he was locked up, this resulted in the confiscation of all of his personal property, including his medical pillow, which had been prescribed to relieve symptoms of vertigo. As a result, he experienced 54 straight days of intermittent vertigo symptoms, which exacerbated his dizziness and prevented him from sleeping while at the same time posing a risk that he could fall and strike his head.

Next, Plaintiff argues that involuntary commitment to a mental hospital implicates a liberty interest, and so involuntary commitment to the MHTDP, when combined with compelled participation in behavior modification as treatment for mental illness, should as well.  He says that on September 25, 2020, Babcock "deliberately misclassified plaintiff as a mental health patient and ordered that he be locked up in 12 Building, C Pod, 61 cell (see exhibit 5), which is a pod and cell specifically designated for mental health patients assigned to the TDCJ Mental Health Therapeutic Diversion Program (see exhibit 19), a program for mentally ill inmates assigned to restrictive housing (see exhibit 20)." On October 8, 2020, Plaintiff contends that Sanders officially committed him to the MHTDP, which subjected him to "mandatory behavior modification as treatment for mental illness."

Plaintiff then poses the question of what process was due before his asserted liberty interest could be deprived. He says that under TDCJ policies, he could only be placed in 12 Building for security detention or prehearing detention. Believing himself to have been placed in pre-hearing detention, Plaintiff states that he filed a grievance on October 2 asking to either receive a

disciplinary hearing or be released pursuant to policy.  Neither of these happened; he states that he remained in 12 Building C pod for 54 days and was never given any hearing, disciplinary or otherwise, and received no notice or documentation why he was placed there.

With regard to a substantive due process claim, Plaintiff states that he has already established that he was denied a protected liberty interest in avoiding commitment to a mental hospital under qualitatively different conditions than a typical prison. He contends that Babcock's decision to arbitrarily declare him a mental health patient, followed by an assignment by Sanders to MHTDP, where he would be subjected to "mandatory behavior modification as a treatment for mental illness," was not rationally related to any legitimate governmental interest. Despite numerous verbal and written requests asking that he be moved, Plaintiff states that Babcock and Sanders chose to leave him in unconstitutional conditions of confinement which they themselves had created and facilitated, without ever giving him a hearing or an explanation.  Plaintiff asserts that Babcock and Sanders then "fabricated an elaborate story to discredit Plaintiff and to portray him as an illegitimate operator and to facilitate Plaintiff's transfer from the Michael Unit, away from his family, immediately on the heels of the filing of the instant lawsuit."

Turning to equal protection, Plaintiff states that on September 25, 2020, he was suspected of having committed a rule violation. As such, he may be placed in pre-hearing detention, which he says is located in 11 Building. However, Plaintiff says that he was not put in pre-hearing detention in 11 Building, but was put in a cell specifically designated for mental health patients assigned to the MHTDP.  He claims that other inmates similarly situated to himself were suspected of committing rule violations equal to that of his were not placed into MHTDP nor even in 12 Building, but rather into 11 Building on pre-hearing detention until their release back into general population shortly thereafter.

Plaintiff asserts that he was purposefully singled out for disparate and unequal treatment which other similarly situated inmates did not receive, which was motivated by "a spiteful effort to get him for something."  He says that the investigation which resulted in his placement in restrictive

housing and assignment to the MHTDP yielded no evidence of wrongdoing by Plaintiff, and the inmate who was the catalyst for the ordeal, Lionel Williams, was not charged with a single thing in connection with the investigation.

Plaintiff argues that his claims for nominal and punitive damages are not barred by the physical injury requirement of the Prison Litigation Reform Act. He says that he can recover compensatory damages because he suffered an actual out-of-pocket loss and that if a jury found that his overall health suffered because of the Defendants' actions or inactions, such as the confiscation and withholding of his medical pillow and his placement in a filthy, dilapidated cell causing him to be "cannibalized by the infestation of hungry insects in his cell," this could amount to physical injury under the Prison Litigation Reform Act.

Finally, Plaintiff argues that all of the rights which he says that the Defendants violated were clearly established in 2020 and that no reasonable prison official could have believed that the conduct of the Defendants was lawful. Hence, he maintains that the Defendants are not entitle to qualified immunity.

Plaintiff's motion for summary judgment largely tracks the arguments made in his response to the Defendants' motion. He asserts that the Defendants Babcock and Sanders "fabricated evidence of a criminal nature against Plaintiff in order to transfer him from the Michael Unit" and that the email approving his transfer was approved one day after Plaintiff handed his lawsuit to prison officials for mailing to the Court.  He states that the email saying he was involved in criminal activity is "completely false and without factual support" and that from September 25, 2020 until the present, he has never spoken to any prison official about why he was locked up, nor has he ever received any paperwork or documentation about the matter. He attaches summary judgment evidence to his response to the Defendants' motion as well as to his own motion.

## IV. Discussion

<u>A. Placement in Restrictive Housing / MHTDP</u>

Plaintiff complains that he was deliberately misclassified as a mental health patient when he was not, and involuntarily placed in the Mental Health Treatment Diversion Program without a hearing or any due process. The Defendants assert that Plaintiff was never placed in the MHTDP but was in 12 Building on transient status.

The Defendants furnish an affidavit from David Stebbins, Program Manager for the MHTDP. (Docket no. 132, p. 2). Stebbins explains that the MHTDP is designed to provide for the mental health needs of outpatient offenders assigned to restrictive housing identified as requiring such services with the goal of assisting them to achieve an optimal level of functioning so they can successfully transition into a less restrictive housing assignment.  Stebbins says that the program is not punitive in nature but instead provides additional services to inmates with mental health issues. Stebbins states that he has reviewed Plaintiff's medical records and there is no indication that Plaintiff was ever enrolled in MHTDP at any time during his incarceration. Plaintiff was seen by the medical staff prior to his transfer to 12 Building and that evaluation noted his lack of prior mental health treatment and that he was not suicidal. On October 19, 2020, Plaintiff submitted an I-60 inmate request form complaining that he learned someone had mistakenly changed  his classification status from Transient to MHTDP on or about October 12, 2020, and Stebbins responded by saying that Plaintiff was not in the MHTDP. (Docket no. 132, p. 9). Plaintiff responded with an I-60 saying "thank you for verifying that I am not in the Mental Health Diversion Program, I was told that they changed me back to transient status." (Docket no. 132, p. 8). Plaintiff's medical records from the September 25 evaluation show that he has no history of mental health treatment and contain no indication that he was assigned to MHTDP. (Docket no. 132, pp. 5-9).

In response, Plaintiff points to a housing / job assignment history record dated December 4, 2020.  This record states that on September 25, Plaintiff was placed in 12CE1-61 pending placement in administrative segregation, and his job assignment was listed as "transient." On October 8, his job assignment was listed as "mental health diversion," and then on October 19, it was changed to "transient pend admin seg." (Docket no. 139-8, p. 2). Plaintiff also attached a disciplinary report dated October 23, 2020 for possession of contraband, with an offense date given as October 5, 2020. This disciplinary report reflects Plaintiff's job as "mental health diversion program."

Plaintiff attaches copies of TDCJ regulations concerning the MHTDP (docket no. 139-25, p. 2).  These regulations explain that the program is a voluntary cognitive-behavioral model which provides assessment, evaluation and treatment, and program participants must participate in group counseling, individual counseling, and self-study programs. The custody classification code is "MH" and inmates must be assigned to restrictive housing, carried on a mental health caseload, have at least one year remaining on their sentence, be approved for housing at MHTDP by the TDCJ Classification and Records Office, and be able to independently perform activities of daily living. Inmates are identified for referral by the TDCJ Office of Mental Health Services Liaison or by the unit mental health staff completing the MHTDP Referral Form in the electronic health record. Discharge from the program can only be approved by the program's senior psychologist, who notifies the mental health services liaison in writing.  The liaison then schedules a state classification committee review for consideration of placement in general population. An inmate who does not complete the program or is discharged for serious rule violations will be reassigned to CMI-Sheltered Housing or referred to another appropriate mental health program.

Other than the documents provided by Plaintiff indicating that he was in the MHTDP, nothing else in the record shows that he was ever in the program.  Stebbins' affidavit states that there is nothing in Plaintiff's medical records showing he was in the program and he was never on a mental health caseload.  There is no referral from the Office of the Mental Health Liaison or the unit mental health staff; rather, Plaintiff contends that he was placed in the program by Sanders, the chief

of unit classification. Although Plaintiff attaches statements recounting his daily activities while in restrictive housing, he makes no mention of having to attend group or individual counseling or receiving a self-study program.

Nor is there any indication that Plaintiff was properly discharged from the program in accordance with the regulations he attaches.  Plaintiff sent an I-60 acknowledging that Stebbins had told him he was not in the program (although Plaintiff argues this meant that he had been removed from the program at the time the I-60 was sent).

Even if a factual dispute exists concerning whether or not Plaintiff was placed in the MHTDP, however, Plaintiff has not shown that any such placement implicated any constitutionally protected liberty interests. The Supreme Court has explained that prisoners have a liberty interest only in freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).  However, prisoners have no liberty interest in their custodial classification, and so placement in administrative segregation or other restrictive housing generally does not implicate a constitutionally protected liberty interest. Luken v. Scott, 71 F.3d 192, 193 (5th Cir. 1995). Plaintiff has not shown that the restrictions placed upon him as a result of his transfer to and confinement in 12 Building for some two months imposed atypical or significant hardships upon him in relation to the ordinary incidents of prison life. See Hollins v. Davis, civil action no. 5:18cv109, 2018 U.S. Dist. LEXIS 219013, 2018 WL 7018717 (N.D.Tex., December 6, 2018) (petitioner's allegations that he was "currently deprived of almost any environmental or sensory stimuli, almost from all human contact, visitation through glass walls, feed [sic] in cell instead of common eating area, lights always on, in a 7 by 14 feet cell with another inmate, 23 or 24 [hours] daily, controlled and monitored by camera and officers, etc." did not show atypical or significant hardship in relation to the ordinary incidents of prison life).

Plaintiff likens his alleged placement in MHTDP to commitment to a mental hospital, as in Vitek v. Jones, 445 U.S. 480, 491, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). However, Plaintiff's circumstances are quite different.  He was simply moved from one building to another, to a building which Plaintiff acknowledged held persons in administrative segregation, transient status and pre-hearing detention as well as MHTDP. He fails to show that he was subjected to stigmatzing consequences or that he was forced to participate in behavior modification programs.

In Toney v. Owens, 779 F.3d 330, 336 (5th Cir. 2015), the plaintiff Michael Toney complained of being classified as a sex offender, as a result of which he was precluded from participating in college trade classes, he was transferred to the Ellis Unit which had sex offender treatment programs, and he suffered great stress and mental anguish causing him to become ill with physical symptoms.  The Fifth Circuit concluded that while Toney undoubtedly suffered stigma as a result of his classification, he was never required to undergo mandatory sex offender treatment. He was required to complete a risk assessment form required of persons identified as sex offenders who were being considered for parole, but this was simply a brief, perfunctory evaluation which was not stigmatizing or invasive. He never became subject to parole conditions because he was never granted parole. Based upon these facts, the Fifth Circuit affirmed the district court's dismissal of the lawsuit based on the fact that Toney did not show that a protected liberty interest was implicated. *See also* Tippens v. Turner, civil action no. 2:04cv315, 2005 U.S. Dist. LEXIS 8596, 2005 WL 1123874 (N.D.Tex., May 10, 2005) (no liberty interest related to removal from the Program for Aggressive Mentally Ill Offenders); Kelly v. Caddo Correctional Center, civil action no. 09-1511, 2012 U.S. Dist. LEXIS 118279, 2012 WL 3610879 (W.D.La., July 12, 2012), *Report adopted  at* 2012 U.S. Dist. LEXIS 118278, 2012 WL 3610828 (W.D.La., August 21, 2012) (placement in mental health observation status did not implicate a liberty interest). Likewise, Plaintiff's transfer to 12 Building, even if done under a brief assignment to the Mental Health Therapeutic Diversion Program, did not implicate any protected liberty interests.

Plaintiff further contends that his alleged placement in MTHDP violated equal protection, identifying himself as a "class of one." In his amended complaint, he asserts that Babcock and Sanders committed him to MHTDP without a hearing in violation of his right to equal protection. In his motion for summary judgment, he contends that other inmates including Leyland Winters and Frederick Villa, whom he says were like himself G2 / S3 minimum custody inmates, suspected of committing rule violations equal to his, were not placed in MHTDP, nor even in 12 Building, but into 11 Building pre-hearing detention until being released back into general population. He points to his own declaration in which he says that shortly after he was placed in restrictive housing, inmate Winters was accused of having "some sort of master key" and Villa was under investigation for possibly possessing drugs; he says that these inmates were placed in 11 Building, and were eventually released to general population. According to Plaintiff, neither of them were ever housed on 12 Building.

Plaintiff argues that in order to state an equal protection claim, the individual must demonstrate that he has been treated differently from others with whom he is similarly situated and that there is no rational basis for the difference in treatment. He says that while TDCJ policy provides that an inmate suspected of a rule violation may be placed in pre-hearing detention, this is not what happened to him; instead, he claims that he was placed in a cell specifically designated for mental health patients in the MHTDP. Plaintiff claims that he was purposefully singled out for disparate and unequal treatment which other similarly situated inmates did not receive, which was motivated by "a spiteful effort to get him for something." He says that the investigation which resulted in his placement in restrictive housing and assignment to the MHTDP yielded no evidence of wrongdoing by Plaintiff, and the inmate who was the catalyst for the incident, Lionel Williams, was not charged with a single thing in connection with the investigation. Plaintiff does not explain how he knows the circumstances involving Winters, Villa, or Williams.

In order to make out an equal protection claim based on a "class of one" theory, Plaintiff must show he has been intentionally treated differently from others similarly situated and there is

no rational basis for the difference in treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). Conclusory allegations are insufficient to support "class of one" discrimination allegations. Bell v. Woods, 382 F.App'x 391, 2010 U.S. App. LEXIS 12627, 2010 WL 2545421 (5th Cir., June 18, 2010), citing Pedraza v. Meyer, 919 F.2d 317, 318 n.1 (5th Cir. 1990) (vague allegation that non-drug addicts received better medical care did not set out an equal protection violation); see also Adkins v. Kaspar, 393 F.3d 559, 566 (rejecting prison discrimination claim based on "bald, unsupported, conclusional allegations").

Plaintiff's allegations regarding discrimination are entirely conclusory. He asserts that two other inmates received differential treatment, but offers in support only his own statement, which fails to indicate any basis for personal knowledge, nor does it set out facts showing that any such differential treatment had no rational basis. Under rational basis review, differential treatment must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts which could provide a rational basis for the classification. Wood v. Collier, 836 F.3d 534, 539 (5th Cir. 2016).

Furthermore, Plaintiff is challenging a prison classification matter which encompasses discretionary decision-making based on subjective, individualized assessments. A number of courts have held that class of one equal protection claims are not viable when based upon individualized assessments of inmates. See, e.g., Dawson v. Norwood, civil action no. 1:06cv914, 2010 U.S. Dist. LEXIS 54306, 2010 WL 2232355 (W.D.Mich., June 1, 2020) (rejecting class of one equal protection claim that he was treated differently from other inmates in administrative segregation because "the class of one equal protection theory has no place in the prison context where a prisoner challenges discretionary decisions regarding security classifications and prisoner placement"); Upthegrove v. Holm, civil action no. 09cv206, 2009 U.S. Dist. LEXIS 38961, 2009 WL 1296969 (W.D.Wis., May 7, 2009) (prisoner's class of one equal protection claim was properly dismissed "in light of current rulings suggesting that class of one equal protection claims are not cognizable in such an individualized and discretionary setting as the prison setting"); Faruq v. McCollum, civil action no.

11-5987, 2013 U.S. Dist. LEXIS 89429, 2013 WL 3283942 (D.N.J., June 25, 2013) ("with regard to security level and placement decisions that are based on individual factors and histories, it is hard to imagine that any inmate would be considered similarly situated [in an equal-protection claim]"), *aff'd* 545 F.App'x 84, 2013 U.S. App. LEXIS 21170, 2013 WL 5670879 (3rd Cir., October 18, 2013); *accord*, Howard v. Koeller, 756 F.App'x 601, 2018 U.S. App. LEXIS 34640, 2018 WL 6445727 (7th Cir., December 10, 2018); Striz v. Collier, civil action no. 3:18cv202, 2020 WL 7868102 (S.D.Tex., November 24, 2020), *aff'd* slip op. no. 20-40878, 2022 U.S. App. LEXIS 12314, 2022 WL 1421834 (5th Cir., May 5, 2022).

Plaintiff here is challenging a discretionary decision regarding security classification and placement, based upon an investigation for alleged misconduct. In a case involving the allegedly discriminatory refusal to release an inmate from segregation, the Fifth Circuit explained "given that prison officials are afforded wide deference in determining a prisoner's custodial status in order to maintain security, we conclude that Escobarrivera failed to plead sufficient facts to carry his heavy burden [of establishing class of one discrimination]." Escobarrivera v. Whitaker, slip op. no. 21-30147, 2022 U.S. App. LEXIS 33223, 2022 WL 17352178 (5th Cir., December 1, 2022). Plaintiff has failed to set out a viable class of one discrimination claim.

B. Conditions of Confinement

Plaintiff asserts that he was placed in a "filthy, dilapidated, roach- and vermin-infested cell, wearing no clothing, with no mattress, sheets, blanket, towel, basic elements of hygiene or cleaning supplies whatsoever." In his response to the motion for summary judgment, he contends that his cell was "completely trashed out, filled with garbage and mattress stuffing, with an abundance of insects, and roaches," and that when the sun went down, "the rats would come out in droves."

According to Plaintiff, he was stripped of his clothes and given only boxers and shoes, and his cell was "bitterly cold." He stated that he was given sheets and socks on September 28, but these were confiscated in a shakedown on October 1 and he did not get more until October 5. He says that

he got his first shower on October 3 and his first roll of toilet paper on October 5, and his first cleaning supplies on October 18.

The Defendants state that inmates at the Michael Unit are provided cleaning supplies every Thursday or upon request. While records are not kept of every time a cell is cleaned, guards are required to fil out daily activity logs (I-260 forms) showing cell cleanliness inspection notes. If a deficiency is not open and obvious, the Defendants say that it is the inmate's responsibility to report deficiencies.  According to the Defendants, the I-260 forms for 12 Building C Block, where Plaintiff was housed, do not show any deficiencies with Cell 61 during the time Plaintiff was there.

The first several pages of logs furnished by the Defendants cover the time period of August 20 through August 31, 2020, prior to Plaintiff's placement there.  (Docket no. 131-5, pp. 4-27).  The logs for October 1 through October 30, 2020, contain a space labeled "Cell Cleanliness Inspection." Each of these logs indicates a time of inspection and the name of the officer, but there are no violations noted on any of the logs for the month of October. (Docket no. 131-5, pp. 28-83).

The logs also contain a page entitled "Cellblock Activities." The only specific mention of Plaintiff by name is on October 5, when it reflects that he went to disciplinary (docket no. 131-5, p. 35). On October 21, 2020, it appears that Cell 61 filed a sick call request, but the name of the inmate is blurred. (Docket no. 131-5, p. 65).

The logs for September 25 through September 30 likewise are blank in the space labeled "Cell Cleanliness Inspections." (Docket no. 131-5, pp. 132-143). The logs for these dates contain no mention of Flores by name. On September 30, there is an entry for which the name is listed as "all" and the cell is listed as 61, indicating that a mental health round lasting four minutes was made. (Docket no. 131-5, p. 143).

The log entries for November 1 through November 17, 2020 are blank in the spaces for cell inspections. (Docket no. 131-5, pp. 144-175). The cell activity log for November 17 reflects that Plaintiff was moved to 7 Building at 7:45 p.m. (Docket no. 131-5, p. 175). No other mentions of Plaintiff or cell 61 appear in the activity logs in the month of November.

Plaintiff argues in his response that while guards are supposed to fill out the I-216 cell inspection logs completely and accurately, they do not do so.  He says that he made numerous verbal and written complaints about his cell deficiencies, but none of these were ever noted. Plaintiff points out that there is not a single mention of any cell deficiencies for any cell on C Block between August 20 and November 30, 2020, and states that inmates have no way of ensuring that guards fill out I-216 forms properly.

Plaintiff submits a sworn declaration (docket no. 139-15) stating that he sent multiple complaints about his conditions of confinement, including two I-60's to the unit safety officer complaining about rats and roaches in his cell.

In another sworn declaration (docket no. 139-12), Plaintiff says that when he was first taken to 12 Building, Lt. Sandel held him in the dayroom while Jackson had the door to 61 cell opened. He states that Jackson went into the cell briefly and then came out, and went and got a push broom. Jackson then went back into 61 cell. Sgt. Sallee looked into 61 Cell and said "man, I thought the cell I put the other guy in was trashed out." Plaintiff says that Jackson pushed some trash into the dayroom and told Sandel to bring Plaintiff to the cell. Jackson pushed Plaintiff into the cell and slammed the door, causing roaches to fall from the door jamb onto Plaintiff.  At that point, Plaintiff states that he immediately noticed a "strong stench of bodily fluids and odor" which made him want to gag.  He squatted down to have the handcuffs removed and looked at the cell, describing it as "the most horrible thing I ever saw in person." According to Plaintiff, there were "hundreds if not thousands of roaches." as well as trash piled up a foot high all around the bunk area and the walls and stuffing from the inside of a mattress.  He also states that there was dried waste in the toilet and smeared on the walls and a leaking sewer pipe underneath which seeped through the cracked concrete, causing black mold to run up the wall by the right side of the cell door.

After Jackson removed one handcuff, Plaintiff told Jackson that he could not leave Plaintiff in a cell like this, but Jackson ignored him. He says that it was freezing cold in the cell and there were spiders and millipedes along with the roaches.  The light fixture had only one bulb that worked

sporadically. Plaintiff states that he found a spoon in the trash and began killing roaches with it. After a few hours, a guard tossed a sack meal into the cell and shut the food slot before Plaintiff could get to it. He yelled to the guard to get some cleaning supplies, toilet paper, clothes, a mattress, and some sheets, but the guard ignored him and left the section.

In this declaration, Plaintiff gives a day-by-day account of his activities in the cell, including constantly asking for cleaning supplies and being ignored. On October 1, he says that he was taken to the recreation yard and when he returned, he saw that all of his sheets, socks, and boxers had been taken, leaving him only a bare mattress and writing materials. On October 5, he says that he received a disciplinary case for allegedly possessing contraband items, and the next day, he stated that he was told to sign an inventory sheet and received his shower shoes, cup, fan, soap dish, toothpaste and toothbrush.

Plaintiff asserts that Warden Babcock personally inspected 12 Building, pointing to his own declaration in which he says that Babcock inspected the pod as can be seen by the visitor log book at the front of 12 Building. Plaintiff contends that each time a staff member enters 12 Building, there are required to sign a log. Plaintiff also claims that it was "common knowledge to everyone" that 12 Building was the dirtiest of all housing areas. He says that he worked in 12 Building as a janitor from April of 2015 to January of 2016, and at that time, he was not allowed to give cleaning chemicals to inmates in restrictive housing for cleaning of personal cells. Plaintiff also says that he worked in 12 Building as a law library assistant from November of 2017 until September of 2020, when this incident took place, and that the legal materials he picked up would have roaches on them. He also states that there were bodily fluids strewn about the dayrooms and runs "on a regular basis," resulting in "a strong stench."

In Taylor v. Riojas, 592 U.S. 7, 141 S.Ct. 52, 208 L.Ed.2d 164 (2020), the petitioner Trent Taylor, a TDCJ inmate, alleged that for six days in September of 2013, prison officials confined him in "shockingly unsanitary" cells. Taylor contended that the first cell was covered in feces and the second cell was frigidly cold and he did not have a bunk or clothes. The Fifth Circuit Court of

Appeals accepted Taylor's verified pleadings as competent summary judgment evidence and concluded that these conditions violated the Eighth Amendment, but determined that the defendants were entitled to qualified immunity because the law was not clearly established that inmates could not be housed under such conditions for only six days. The Supreme Court reversed this determination, concluding that no reasonable correctional officer could have believed that it was constitutionally permissible to house Taylor "in such deplorably unsanitary conditions for such an extended length of time." Plaintiff's description of his cell is akin to that in Taylor.

Plaintiff asserts that Jackson saw the cell in which he was placed and actually went inside it, giving Jackson personal knowledge of the alleged state of the cell.  The Defendants do not furnish any summary judgment evidence showing the condition of Plaintiff's cell, nor provide medical records concerning Plaintiff's physical condition as a result of exposure to these alleged conditions. Jackson has not shown that he is entitled to summary judgment on this claim.

Plaintiff contends that Warden Babcock "personally inspected the housing areas in 12 Building on a regular basis," but as proof of this, points only to his own declaration, which states as follows:

> Defendant Babcock personally inspected 12 Building, to include C Pod, the pod I was assigned to from September 25, 2020, to November 17, 2020, on numerous occasions. Proof of this can be found in the visitor's sign in log books at the front of 12 Building, directly outside of the control picket, and in each pod, usually located on a table outside of the control picket by the front entrance, directly in front of the window looking out to the rec yard.  Each time a staff member entered 12 Building, and/or a pod, they were required by TDCJ policy to sign the log book, notating the dates and times entered, and times when they left.

Plaintiff does not furnish a copy of this log book, nor does he explain how he knows its purported contents. Nor does he assert that he has personal knowledge of Warden Babcock ever actually inspecting or even visiting 12 Building. Such conclusory allegations are insufficient to show that Warden Babcock had any personal knowledge of or involvement with the conditions of Plaintiff's cell. See Silva v. Moses, 542 F.App'x 309, 2013 U.S. App. LEXIS 20101, 2013 WL 5450799 (5th Cir., October 1, 2013) (speculative allegations are not sufficient to show personal involvement by the sheriff or warden); Martinez v. Texas Department of Criminal Justice, 641

23

F.Supp.3d 384, 392 (S.D.Tex. 2022) (conclusory allegations of warden's alleged involvement were insufficient); Dickerson v. Byrd, civil action no. 5:13cv202, 2016 U.S. Dist. LEXIS 33960, 2016 WL 1046823 (S.D.Miss., January 19, 2016) (assertion that certain areas of a prison are "well known" to be dangerous or violent is not sufficient to show deliberate indifference by prison officials).

Nor has Plaintiff shown that Warden Babcock is responsible for a custom or policy causing a constitutional deprivation. See Spiller v. City of Texas City, Texas Police Department, 130F.3d 162, 167 (5th Cir. 1997) (in order to satisfy the cause in fact requirement, the plaintiff must allege that a custom or policy served as the moving force behind a constitutional deprivation at issue or that his injures resulted from the execution of the policy or custom; the description of the policy or custom and its relationship to the underlying constitutional violation cannot be conclusory, but must contain specific facts). The summary judgment evidence shows that a policy existed of providing inmates with cleaning supplies every week, and even if a custom existed of not complying with this policy, Plaintiff has offered nothing to show that Warden Babcock had any personal knowledge of, involvement with, or responsibility for such a custom. See Alderson v. Concordia Parish Correctional Facility, 848 F.3d 415, 420 (5th Cir. 2017). Warden Babcock's position as warden does not itself form a basis for liability absent a showing that he either participated in acts causing a constitutional deprivation or implemented unconstitutional policies or customs causally connected to plaintiff's injuries. Id. at 421. Similarly, the fact that Warden Babcock ordered a unit lockdown on September 18 does not show that the Warden was personally involved with or otherwise responsible for the condition of his cell.

Plaintiff next contends that Sanders "did deliberately leave plaintiff in subhuman conditions of confinement, denying plaintiff the minimal civilized measure of life's necessities, thereby exposing him to a substantial risk of serious harm, despite repeated verbal and written complaints, grievances, I-60's, and phone calls from plaintiff's family, in violation of plaintiff's well established Eighth Amendment right not to be subjected to calloused and deliberate indifference." He offers

nothing to suggest that Sanders had personal knowledge of the condition of his cell. The fact that he may have sent grievances or I-60 requests to Sanders, or that Sanders may have spoken by phone to Plaintiff's family members, is not sufficient to show personal involvement. The Defendants' motion for summary judgment should be granted as to Babcock and Sanders on this point.

C. Plaintiff's Property Claims

Plaintiff asserts that on October 2, 2020, Officer Cunningham enforced and applied TDCJ Administrative Directive 03.72 against him in an arbitrary and capricious manner to deprive him of his personal property, in violation of his right to due process and equal protection. He also claims that Cunningham "did enforce and apply TDCJ Administrative Directive 03.72 against plaintiff in an arbitrary and capricious manner, to punish plaintiff without prior notice or fair warning, that he could not possess commissary for more than 60 days, in violation of his well established 14th Amendment substantive due process right not to be punished for acts which he could not have known were prohibited." However, Plaintiff's claims against Cunningham have previously been dismissed for failure to exhaust administrative remedies.

Plaintiff also asserts that because Babcock ordered him locked up, TDCJ Administrative Directive 03.72, security memorandums, and post orders all mandated that his property be confiscated and inventoried. The summary judgment evidence shows that Plaintiff's property was inventoried on October 2, 2020, at which time he possessed 19 dry milks, packages of food including three peanuts, four chicken chunks, one barbeque, five mackerels, one tuna, two sandwich spreads, one refried beans, one rice, one package of tortillas, and one jar of pickles. He also had a fan, headphones, ear buds, a lamp, an alarm clock, a radio, a typewriter, a cane, three pairs of gym shorts, two pairs of shoes (Reebok and New Balance), two pairs of socks, two thermal bottoms, a thermal top, a chill towel, a light bulb, Q tips, chapstick, five combs, a pack of dental flossers, a deodorant, two liquid soaps, some hair dressing, one hair gel, lotion, 13 disposable razors, one shampoo, two soap dishes, five toothbrush holders, seven toothpastes, three mirrors, 35 stamps, two protractors, a bundle of paper, an eraser, a tablet, a ruler, a calculator, 14 commissary bags, a pencil

sharpener, five plastic bowls, a plastic lock/key, four small nail clippers, six spoons, two batteries, five pairs of earplugs, a sheet of carbon paper, six folders, two brown file folders, 23 colored file folders, seven typewriter ribbons, two typewriter correction tapes, four rolls of toilet paper, a knee brace, and a pillow case. All of these items are listed as being stored in the property room and returned to Plaintiff on October 9. (Docket no. 131-3, p. 4).

Another form lists the property confiscated from Plaintiff as being altered or not purchased by him. These items are listed as 130 [sic] chocolate chike [a brand of protein shake or powder], 7 strawberry chike, one vanilla chike, four packs of cream cheese, one pack of tortilla chips, two bags of coffee, 14 packs of ranch dressing, five packs of barbeque sauce, two packs of chili without beans, three packs of chili with beans, 10 packs of "rip ready beef," 8 packs of peanut butter, three packs of pickles, 14 chicken soups, 30 bottles of water, one pack of trail mix, 10 packs of dry milk, one hot pot listed as "altered," one multi-outlet listed as "altered," four packs of multi-vitamins listed as "not correct jar," a ream of paper, 37 stamps listed as "not TDCJ," a commissary bag listed as "altered," three small bottles, 12 oatmeal packets, seven mackerel fillets, 11 granola bars, one chili soup, one veggie soup, and four packs of refried beans. (Docket no. 131-3, p. 5).

On October 5, 2020, Plaintiff received a disciplinary case for possession of contraband, charging him with possession of items not purchased through the commissary and altering the hot pot and multi-outlet (docket no. 131-3, p. 6). A hearing was held on October 25, 2020, at which Plaintiff pleaded not guilty but was found guilty and sentenced to 15 days of cell, commissary, and recreation restrictions. (Docket no. 131-3, p. 9).

The fact that some of Plaintiff's property was taken after he went into restrictive housing, and then not returned to him for a week, does not set out a constitutional violation. In Quaak v. Yeager, civil action no. 4:11cv2100, 2012 U.S. Dist. LEXIS 36432, 2012 WL 950183 (S.D.Tex., March 19, 2012), *appeal dismissed as frivolous* 513 F.App'x 405, 2013 U.S. App. LEXIS 3490, 2013 WL 616989 (5th Cir., February 19, 2013), the plaintiff John Quaak alleged that he was placed in pre-hearing detention and his property taken and placed in a locker box which he could not

access. He was without his personal or legal property for 23 days. The Southern District of Texas observed that as a prisoner, Quaak had no legally protected interest in the possession of personal property as a general matter, and that reasonable restrictions could be imposed on the type and amount of personal property which inmates can possess. The court stated that Quaak was informed of the location of the property and given the opportunity to complain about the deprivation by grievance; thus, even though the grievances were denied, Quaak was not deprived of his property without due process.

In Hines v. Marshall, civil action no. 6:18cv344, 2020 U.S. Dist. LEXIS 102168, 2020 WL 3066653 (E.D.Tex., April 9, 2020), *Report adopted at* 2020 U.S. Dist. LEXIS 101246, 2020 WL 3064795 (E.D.Tex., June 9, 2020), *aff'd* slip op. no. 20-40444, 2021 U.S. App. LEXIS 29623, 2021 WL 4515392 (5th Cir., October 1, 2021), the plaintiff Kennie Hines filed a grievance against an officer named McLain, alleging sexual misconduct. Hines was placed in segregation and his property, including a Fossil watch and a pair of New Balance shoes, was confiscated; he claimed that this was done in retaliation, while prison officials maintained that he was placed in segregation to remove him from potential contact with McLain and to preserve the integrity of the investigation. Upon discovery that Hines had a watch which did not belong to him, he received a disciplinary case for contraband. While Hines later received back most of his property, including the Fossil watch and a pair of Reebok shoes, he never got back his New Balance shoes.

The district court held that for the purposes of a retaliation claim, the temporary deprivation of the watch and Reebok shoes, and the confiscation of the New Balance shoes, was a *de minimis* injury. The Fifth Circuit affirmed this decision on appeal, stating that "here, Hines's complaint concerning the temporary deprivation of several pieces of his property and the purported confiscation of a pair of tennis shoes involves at most a de minimis injury insufficient to deter a person of ordinary firmness from further exercising his constitutional rights."

The district court in Hines cited Hurd v. Barnett, civil action no. 6:15cv734, 2017 U.S. Dist. LEXIS 32122, 2017 WL 9289643 (E.D. Tex., January 24, 2017), *Report adopted at* 2017 U.S. Dist.

LEXIS 31917, 2017 WL 892118 (E.D. Tex., March 6, 2017), *appeal dismissed as frivolous* 714 F.App'x 444, 2018 U.S. App. LEXIS 6190, 2018 WL 1311943 (5th Cir. March 13, 2018), in which the plaintiff Herschel Hurd contended that Officer Barnett improperly withdrew $58.55 from his inmate trust account. Two days later, she took his ID card and did not replace it, purportedly in retaliation for his reporting the theft of the money. Another officer, Campbell, searched Hurd's property, supposedly looking for the commissary items which had been purchased with the $58.55, and confiscated all of the commissary items he had ever purchased, none of which had anything to do with the money withdrawn from his account by Barnett. Later, all of his property except for his radio was returned by the property officer, who told him that he was not getting his radio back because he "liked to file grievances."  In analyzing Hurd's retaliation claim, the district court stated that "even assuming the defendants acted in a retaliatory manner, the conduct complained of - the cell searches, the temporary deprivation of his property, and the loss of his radio - was de minimis and thus cannot support a constitutional claim of retaliation."  *See also* <u>Ali v. Jones</u>, civil action no. 4:07cv337, 2007 U.S. Dist. LEXIS 52901, 2007 WL 2141381 (S.D. Tex., July 19, 2007) (where a guard allegedly destroyed the prisoner's personal property including four books, ten magazines, vitamins, several pencil sharpeners, six ink pens, and a set of drawing pencils, the Southern District of Texas held that the prisoner could not show that the allegedly adverse act constituted more than a de minimis injury); <u>Scott v. Haney</u>, civil action no. 12-0439, 2012 U.S. Dist. LEXIS 178826, 2012 WL 6569308 (M.D. La., November 9, 2012), Report adopted at 2012 U.S. Dist. LEXIS 177868, 2012 WL 6569295 (M.D. La., December 17, 2012) (prisoner alleged that some of his legal work was destroyed in retaliation for his having filed grievances; the Middle District of Louisiana held that "even if defendant Haney's conduct was in fact retaliatory, the Court finds that the defendant's conduct amounted to no more than a *de minimis* or inconsequential 'retaliatory adverse act.'")

The fact that Warden Babcock ordered Plaintiff placed in restrictive housing does not thereby render Babcock liable for any confiscation or retention of Plaintiff's property. Even if liability for Plaintiff's property were to somehow attach from the mere fact of ordering him placed into

restrictive housing, the temporary deprivation of some of his property does not amount to a constitutional violation. This claim is without merit.

While some of Plaintiff's property was determined to be contraband, and therefore presumably not returned to him, this likewise does not set out any constitutional violation. He was given a hearing and also had the opportunity to challenge the deprivation through the grievance process. The Fifth Circuit has explained that while the deprivation of constitutionally protected interests pursuant to established state policy may violate due process despite the availability of post-deprivation remedies, the necessity for quick action by the state coupled with an adequate post deprivation hearing may obviate the need for a predeprivation hearing. McQueen v. Vance, 68 F.3d 471, 1995 U.S. App. LEXIS 42261, 1995 WL 581861 (5th Cir., September 20, 1995), *citing* Matthias v. Bingley, 906 F.2d 1047, 1056 (5th Cir.), *modified in part on other grounds*, 915 F.2d 946 (5th Cir. 1990) *and* Beck v. Lynaugh, 842 F.2d 759, 761 (5th Cir.1988).

The court went on to state that "prison security demands require that prison officials be able to deprive inmates of property believed to be contraband without holding a pre-deprivation hearing. Prison officials therefore may satisfy the demands of due process with adequate post-deprivation proceedings. TDCJ's post-deprivation grievance procedures are adequate to satisfy the Due Process Clause." McQueen, 68 F.3d 471 at *2-3, *citing* McBride v. Collins, 15 F.3d 181, 1994 U.S. App. LEXIS 42148, 1994 WL 24960 (5th Cir., January 19, 1994). Plaintiff has not shown a deprivation of due process with regard to the property confiscated as contraband. Warden Babcock is entitled to summary judgment on this point.

D. Qualified Immunity

The Defendants invoke their entitlement to qualified immunity. In order to overcome qualified immunity, a plaintiff must allege facts showing that the government official violated a constitutional right and that the right was clearly established at the time of the challenged conduct. Laviage v. Fite, 47 F.4th 402, 405 (5th Cir. 2022). The Fifth Circuit has explained as follows:

> Qualified immunity shields government officials from civil liability in their individual capacity so long as their conduct 'does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known.' Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). It protects 'all but the plainly incompetent or those who knowingly violate the law.' Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986).

Our qualified immunity inquiry is two-pronged. Garcia v. Blevins, 957 F.3d 596, 600 (5th Cir. 2020). First, we ask whether the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right. Second, we ask whether the right was 'clearly established.' Id. We can analyze the prongs in either order or resolve the case on a single prong. Id.

After explaining that a right is "clearly established" only if it is sufficiently clear that every reasonable official would have understood that the defendant's conduct violated that right, and that there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that the conduct is definitively unlawful, the Fifth Circuit went on to state:

When an official raises qualified immunity on summary judgment, as Sheriff Castloo did here, the plaintiff bears the burden of showing that the defense does not apply. See Bryant v. Gillem, 965 F.3d 387, 391 (5th Cir. 2020). To meet that burden, the plaintiff must present evidence, viewed in her [i.e. the plaintiff's] favor, satisfying both qualified immunity prongs by showing that the defendant (1) violated a constitutional right (2) that was clearly established at the time of the defendant's conduct. See id.

Cunningham v. Castloo, 983 F.3d 185, 190-91 (5th Cir. 2020); Byrd v. Harrell, 48 F.4th 343, 346 (5th Cir. 2022) (when an official has asserted qualified immunity, the burden shifts to the plaintiff to rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct). Conclusory allegations are insufficient to overcome the qualified immunity defense. Williams-Boldware v. Denton County, Texas, 741 F.3d 635, 643-44 (5th Cir. 2014).

Plaintiff has not shown that the Defendants Warden Babcock and Lt. Sanders violated any clearly established constitutional right of which a reasonable person would have known. Consequently, these Defendants are entitled to qualified immunity.

Plaintiff's pleadings and summary judgment evidence, viewed in the light most favorable to the party asserting the injury, allege that Officer Jackson put him in a cell which Jackson knew, from having just gone inside, was not fit for human habitation. Such a claim, if proven, shows the

violation of a constitutional right which was clearly established in 2020 and of which a reasonable prison guard would have known. Officer Jackson is not entitled to qualified immunity on that claim.

## V. Conclusion

Summary judgment is properly granted only when, viewing the evidence in the light most favorable to the non-moving party, the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Ellis v. Garza-Lopez, slip op. no. 23-10022, 2023 U.S. App. LEXIS 13305, 2023 WL 3723634 (5th Cir., May 30, 2023); Burleson v. Texas Department of Criminal Justice, 393 F.3d 577, 589 (5th Cir. 2004). If the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial. Id., *citing* Allen v. Rapides Parish School Board, 204 F.3d 619, 621 (5th Cir. 2000).

The plaintiff cannot oppose summary judgment by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated or speculative assertions, or by only a scintilla of evidence. Boudreaux v. Swift Transportation Co., Inc., 402 F.3d 536, 540 (5th Cir. 2005); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). There is no genuine issue for trial if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. Prison Legal News v. Livingston, 683 F.3d 201, 211 (5th Cir. 2012).

The court has no obligation to sift the record in search of evidence to support a party's opposition to summary judgment. Adams v. Traveler's Indemnity Co., 465 F.3d 156, 164 (5th Cir. 2008). Instead, a party opposing summary judgment must identify specific evidence in the record which supports the challenged claims and articulate the precise manner in which the evidence supports the challenged claim. Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998). A properly supported motion for summary judgment should be granted unless the opposing party produces sufficient evidence to show a genuine factual issue exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

<u>RECOMMENDATION</u>

It is accordingly recommended that the motion for summary judgment by the Defendants Richard Babcock, Laurens Jackson, and Jennifer Sanders (Dkt. No. 131) be granted as to the Defendants Babcock and Sanders, and denied as to the claim that Defendant Jackson placed Plaintiff into a cell unfit for human habitation and left him there for an extended period of time.  This claim should be the only one remaining in the case.  It is further recommended that Babcock and Sanders be dismissed as parties to this lawsuit.

A copy of these findings, conclusions and recommendations shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions, and recommendations must file specific written objections within 14 days after being served with a copy.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's proposed findings, conclusions, and recommendation where the disputed determination is found. An objection which merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific, and the district court need not consider frivolous, conclusive, or general objections. *See* <u>Battle v. United States Parole Commission</u>, 834 F.2d 419, 421 (5th Cir. 1987).

Failure to file specific written objections will bar the objecting party from appealing the factual findings and legal conclusions of the Magistrate Judge which are accepted and adopted by the district court except upon grounds of plain error. <u>Duarte v. City of Lewisville</u>, 858 F.3d 348, 352 (5th Cir. 2017).

**So ORDERED and SIGNED this 10th day of January, 2024.**

32  *John P Love*
_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE